IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RONALD K. HART, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-11-2261 |
| BROADWAY SERVICES, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Ronald K. Hart ("Plaintiff" or "Mr. Hart") has filed this *pro se* employment discrimination action against his former employer, Defendant Broadway Services, Inc. ("Defendant"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*. Mr. Hart was terminated after Broadway discovered that he had reported to work while intoxicated. He alleges that he was discharged, suffered harassment, and was denied promotional opportunities because of his race. Pending before this Court is Defendant's Motion for Summary Judgment. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Defendant Broadway Services, Inc.'s Motion for Summary Judgment (ECF No. 10) is GRANTED.

### BACKGROUND

This Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Defendant Broadway Services, Inc. ("Defendant" or "Broadway") is a contract management company with 1,400

employees who provide housekeeping, security, and transportation services to hospitals and other businesses, including Johns Hopkins Bayview Medical Center ("Johns Hopkins Bayview"). Def.'s Mot. Summ. J. 1, ECF No. 10. On May 1, 2006, Broadway hired Ronald K. Hart ("Plaintiff" or "Mr. Hart"), who is an African American male, to serve as a supervisor in the Environmental Services Department ("EVS") at Johns Hopkins Bayview. Pl.'s Resp. in Opp. to Mot. Summ. J. 1, ECF No. 14. Mr. Hart's job involved supervising a housekeeping crew of fifteen to twenty employees who clean hospital rooms, dispose of trash on hospital floors, and perform other maintenance tasks. *See* Pl.'s Exs. 13B & 2C; Kelly. Aff. ¶ 2, ECF No. 10-2.

At the time Mr. Hart was hired, he was required to attend an employee orientation conducted by Broadway's human resources department. Kelly Aff. ¶ 6. At this orientation, Mr. Hart received Broadway's Substance Abuse Policy, which specifies that any employee who is "suspected of engaging in misuse, abuse, or illegal use of alcohol, drugs or controlled substances" may be required to submit to a drug test. Substance Abuse Policy 1, ECF No. 10-4; Kelly Aff. ¶ 6. Under the Substance Abuse Policy, an employee testing positive for drugs or alcohol is subject to discharge. Substance Abuse Policy 1-2. Mr. Hart signed the Substance Abuse Policy on April 28, 2006. *Id.* at 3. Broadway's Standards of Conduct, which Mr. Hart also received at orientation, lists "reporting to work while under the influence" of an intoxicant as the violation of a major disciplinary rule, justifying immediate suspension pending discharge. Standards of Conduct, ECF No. 10-5.

Mr. Hart performed his supervisory duties without incident from the time he was hired until 2007. Def.'s Mot. Summ. J. 2; Pl.'s Resp. in Opp. 1. Indeed, Mr. Hart received

several positive evaluations and more informal compliments on his work throughout his career at Broadway. For example, Mr. Hart received "highly effective" or "outstanding" performance evaluations for the employment periods of 2006 through 2007 and 2007 through May 1, 2008. Pl.'s Resp. in Opp. Exs. 1B-9B. A few times over the course of his employment, Mr. Hart was considered for a "shining star" award, which is given out to the employees of the month. *See* Pl.'s Exs. 15B & 16B. In addition, Mr. Hart and his housekeeping crew received an award in 2007 for excellent cleaning of a hospital room, which prevented a stomach virus from spreading throughout the hospital floor. *See* Pl.'s Exs. 11B-14B.

Beginning in 2007, however, Mr. Hart's job performance came under scrutiny at least ten times. Several of these incidents involved Broadway's weekly departmental performance surveys that Mr. Hart was required to submit to his superior, Assistant Director of EVS Walter Spears ("Mr. Spears").[1] Although Mr. Hart was asked to submit these surveys regularly, he failed to submit his first installment of surveys by the due date, July 30, 2007. Spears Mem. July 30, 2007, ECF No. 10-6. Mr. Spears gave Mr. Hart a "verbal warning" and informed him that his noncompliance would be considered "poor job performance." *Id.* Despite this warning, Mr. Hart never turned in his first installment of surveys, prompting Mr. Spears to issue a second verbal warning on December 3, 2007, Spears Mem. Dec. 3, 2007, ECF No. 10-7, and a written warning on December 10, 2007, Spears Mem. Dec. 10, 2007, ECF No. 10-8. Finally, Mr. Spears suspended Mr. Hart for one day without pay for his continued failure to submit the first installment of surveys. Spears Mem. Feb. 25, 2008,

---

[1] The Defendant notes that Mr. Spears is an African American male. Def.'s Mot. Summ. J. 2.

ECF No. 10-10.  In response to these allegations, Mr. Hart claims that the submission of the weekly departmental performance surveys was "nearly impossible to do."  Pl.'s Resp. in Opp. 2.  He also claims that EVS Director Robert Gair ("Mr. Gair") reviewed the situation and determined that Mr. Spears's survey requests were "not reasonable."[2]

In 2008 and 2009, Mr. Hart was subject to disciplinary actions on five other occasions before the violation leading to his termination.  First, on February 12, 2008, EVS Manager Michael Williams ("Mr. Williams")[3] issued Mr. Hart a verbal warning for his poor handling of the disposal of biohazard trash, which caused a safety hazard.  Williams Mem. Feb. 12, 2008, ECF No. 10-9.  Mr. Hart explains in response that this sort of trash disposal has "always been an issue" because the task "is almost impossible" to do well.  Pl.'s Resp. in Opp. 3.

Second, on December 23, 2008, a new EVS Director Katya Petersen ("Ms. Petersen")[4] issued Mr. Hart a notice of suspension relating to poor job performance that resulted in a patient remaining in the emergency room longer than necessary.  Notice of Suspension, Dec. 23, 2008, ECF No. 10-11.  Mr. Hart does not contest that the incident in the emergency room happened as Ms. Petersen described it.  Nevertheless, he asserts that this disciplinary action was the result of Ms. Petersen's "desperate attempt to suspend [him]," and that in her notice she included a false statement pertaining to job counseling sessions that Mr. Hart claims never to have attended.  Pl.'s Resp. in Opp. 3.

Mr. Hart's third suspension came on February 9, 2009, when Mr. Williams penalized

---

[2] *Id.*  Mr. Hart does not provide any evidence of Mr. Gair's alleged decision.
[3] The Defendant notes that Mr. Williams is an African American male.  Def.'s Mot. Summ. J. 2.
[4] The Defendant notes that Ms. Petersen is a Caucasian female.  Def.'s Mot. Summ. J. 3.  She became EVS Director in November 2008.  *Id.*

him for leaving trash piled up in the hospital during his shift. *See* Ronald Hart Suspension Statement, ECF No. 10-12. In response, Mr. Hart contended that he was unfairly suspended because the previous housekeeping crew had failed to clean up their share of trash. *Id.* Mr. Hart now argues that his suspension was supposed to be removed, and that he was eventually paid for the day he was suspended.[5]

On April 10, 2009, Ms. Petersen issued a final warning to Mr. Hart for "excessive absences." Petersen Mem. April 10, 2009, ECF No. 10-13. Again, Mr. Hart claims that Ms. Petersen's warning contained false statements, and he suggests that this warning was her "way of harassing [him]." Pl.'s Resp. in Opp. 3-4.

Finally, Mr. Hart failed to show up to work on Memorial Day, May 25, 2009. Barbara Pettit E-mail May 27, 2009, ECF No. 10-14. It is unclear whether Mr. Hart was subject to any disciplinary measure for this absence, but his superiors did keep a record of it. *Id.* Mr. Hart explains that he and another employee requested to switch shifts so that Mr. Hart would not work on Memorial Day, and that their request was granted. Pl.'s Resp. in Opp. 4. When the other employee failed to show up, Mr. Hart was unfairly blamed for his absence. *Id.*

On September 3, 2009, Mr. Hart committed the violation that led to his termination: he reported to work while under the influence of alcohol. That day, EVS Manager Gerald Oliver[6] smelled an odor of alcohol while meeting with two supervisors, Mr. Hart and Primus Jones. Def.'s Mot. Summ. J. 3 & Ex. M, ECF No. 10-15; Pl.'s Resp. in Opp. 4. Both

---

[5] Pl.'s Resp. in Opp. 3. Mr. Hart proffers no evidence suggesting that his February 9, 2009 suspension was revoked.

[6] The Defendant notes that Mr. Oliver is an African American male. Def.'s Mot. Summ. J. 3.

supervisors were sent to an emergency room to be tested for alcohol pursuant to Broadway's Substance Abuse Policy. Def.'s Mot. Summ J. 3 & Ex. M; Pl.'s Resp. in Opp. 5. While Mr. Jones's test came back negative, Mr. Hart's test showed that he had a blood alcohol level of .106 percent. Def.'s Mot. Summ. J. 3 & Ex. M. In accordance with Broadway's Standards of Conduct, Mr. Hart was suspended pending termination. Standards of Conduct, ECF No. 10-5.

On September 11, 2009, Donald F. Kelly ("Mr. Kelly"), Broadway's Vice President for Environmental Services and Facility Management, approved Mr. Hart's discharge. Def.'s Mot. Summ. J. Ex. M. Mr. Kelly came to this decision because Broadway's Standards of Conduct prohibit an employee from reporting to work while under the influence of an intoxicant. Kelly Aff. ¶ 22. That Hart was a supervisor charged with enforcing the Standards of Conduct made the situation "even more egregious." *Id.* Mr. Kelly also considered "Mr. Hart's poor overall job performance during his relatively short tenure at [Broadway]" when making his decision. *Id.*

On April 15, 2010, Mr. Hart filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Human Relations. Pl.'s Resp. in Opp. Ex. 7A. In this charge, Mr. Hart claimed that he was discriminated against due to his race in violation of Title VII, both when he was suspended in February 2009 and when he was ultimately terminated on September 11, 2009. *Id.* Mr. Hart also asserted that he had "good performance" until Ms. Petersen became EVS Director. *Id.* The EEOC was unable to conclude whether Mr. Hart's allegations established a violation under Title VII and issued Mr. Hart a right to sue letter on July 29, 2011. EEOC

Dismissal and Notice of Rights, Pl.'s Resp. in Opp. Ex. 5A.  Mr. Hart then filed this action, alleging race discrimination in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, on August 16, 2011.  In his Complaint, Mr. Hart alleges discrimination with regard to his termination, his failure to be promoted twice in 2009, and the harassment he suffered under EVS Director Katya Petersen.

Elaborating on his claims of discrimination, Mr. Hart maintains that he performed his job well and received positive assessments on his work while he was employed at Broadway.  When Ms. Petersen became a director of EVS in November 2008, however, she tried to find deficiencies in his job performance and harassed him and his housekeeping crew during their shift.  Pl.'s Resp. in Opp. 3.  In addition to his allegations that Ms. Petersen lied in two disciplinary warnings which he received, Mr. Hart claims that she moved him back and forth between day and night shifts three times in less than one year.  Pl.'s Resp. in Opp. 4; Pl.'s Compl. ¶ 6.  As a result, he had trouble arranging for parking and day care for his children, and he sometimes reported to work late.  Pl.'s Resp. in Opp. 4.

Mr. Hart claims that he reported harassment by Ms. Petersen to his employer several times.  Pl.'s Resp. in Opp. 5.  However, Broadway insists that Mr. Hart never complained of harassment or discrimination based on his race more generally.  Def.'s Mot. Summ. J. 4.  Mr. Hart also alleges that Ms. Petersen took various disciplinary actions against other African American managers and supervisors.[7]  Mr. Kelly explains that the suggestion that Ms. Petersen was acting out of a racial motivation is "misplaced."  Kelly Aff. ¶ 26.  One of the

---

[7] Specifically, Mr. Hart alleges that Ms. Petersen "moved 3 managers as a disciplinary action, terminated 1 manager whom [sic] won a case w [sic] Broadway Services, terminated 1 supervisor [and] was forced to hire [her] back, fired 2 secretaries, fired 2 supervisors and settled [a] claim for harassing one supervisor, all black."  Pl.'s Compl. ¶ 6.

employees Mr. Hart refers to was temporarily laid off and then rehired as an EVS manager; another was discharged for viewing pornography on a hospital computer; and a third was denied unemployment insurance on the grounds of work-related misconduct. *Id.* ¶ 27.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*,

190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

In its Motion for Summary Judgment, Defendant Broadway contends that two claims made by Mr. Hart—that he was denied promotional opportunities and that he suffered workplace harassment—should be dismissed. Because Mr. Hart did not include them in his charge of discrimination to the EEOC, Broadway argues that he has failed to exhaust his administrative remedies. As for Mr. Hart's claim of discrimination with regard to his termination, Broadway contends that Mr. Hart fails to establish the prima facie case for race discrimination. Even if he could make out that case, he has not shown that Broadway's alleged reason for his termination is pretextual. The preliminary issue of exhaustion of administrative remedies will be addressed before considering the substantive challenges in Defendant's Motion for Summary Judgment.

### I.    Plaintiff's Exhaustion of Administrative Remedies

Mr. Hart alleges race discrimination with regard to three types of incidents: his termination, his failure to receive a promotion on two separate occasions in 2009, and Ms. Petersen's harassment. In his charge of discrimination filed with the EEOC, he accused his employer of race discrimination only as to his termination. Thus Defendant Broadway argues that the claims regarding failure to promote and harassment should be dismissed for failure to exhaust administrative remedies. Further, to the extent that the alleged conduct in

these claims occurred 300 days prior to April 15, 2010, when Mr. Hart filed his charge of discrimination with the EEOC, Broadway argues that they would be untimely.[8]

Before a plaintiff may file suit under Title VII, he must first file a charge of discrimination with the EEOC. *Jones v. Calvert Grp.*, 551 F.3d 297, 300 (4th Cir. 2009). The contents of that charge frame the plaintiff's later federal claim. *Id.* In a Title VII action, a party will be heard only on those "claims stated in the initial [EEOC] charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). "Thus, a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Jones*, 551 F.3d at 300 (citing *Evans*, 80 F.3d at 963). This exhaustion requirement is important, because a failure to exhaust administrative remedies deprives a federal court of jurisdiction over the claim. *Id.*

A court must be careful when applying the exhaustion requirement, however, because Title VII "does not require procedural exactness from lay complainants." *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988). The Court of Appeals for the Fourth Circuit offers a countervailing consideration to the exhaustion rule: because EEOC charges are made "by those unschooled in the technicalities of formal pleading," they

---

[8] Title VII establishes two potential limitations periods within which a charge of discrimination must be filed with the EEOC. *Edelman v. Lynchburg Coll.*, 228 F.3d 503, 506 (4th Cir. 2000). The general limitations period is 180 days after the alleged unlawful employment practice. *Id.* If, however, state law proscribes the alleged employment practice and the charge is first filed with a state deferral agency, then the limitations period is extended to 300 days. *Id.*; *see also Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998). Maryland is a "deferral state" in which the 300-day limitations period applies. *See, e.g., Prelich v. Medical Resources, Inc.*, 813 F. Supp. 2d 654, 661-62 (D. Md. 2001).

must be construed with "utmost liberality." *Id.*  Indeed, the Court has cautioned that "[t]he charge is not to be treated as common-law pleading." *EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 364 (4th Cir. 1976).  Instead, a plaintiff satisfies the exhaustion requirement if his claim is reasonably related to the original complaint or if, through reasonable investigation, it would develop out of the original complaint.  *Evans*, 80 F.3d at 963.

Because Mr. Hart has filed this action *pro se*, it will be construed with the "utmost liberality." *Alvarado*, 848 F.2d at 460.  Mr. Hart did not specifically list the harassment and failure to promote claims in his charge of discrimination to the EEOC.  Nevertheless, it is clear that these claims revolve around his interactions with Ms. Petersen, and Mr. Hart did note in his EEOC charge that he had "good performance until Kataya [sic] Petersen became Director."  Pl.'s Resp. in Opp. Ex. 7A.  It is possible that through reasonable investigation these claims would have developed out of Mr. Hart's original complaint to the EEOC.  Therefore, these claims will be treated as having satisfied the exhaustion requirement.

Although Title VII provides a maximum of 300 days[9] from the occurrence of an alleged discriminatory act to file a charge with the EEOC, *Evans*, 80 F.3d at 962, it is not evident that Mr. Hart's claims of discrimination are untimely.  Mr. Hart filed his charge of discrimination with the EEOC on April 15, 2010.  Discriminatory acts occurring from June 19, 2009 onward, therefore, would not be time-barred.  In November 2008, Ms. Petersen became EVS Director.  Presumably, some of the harassment that Mr. Hart alleges occurred within the June 19, 2009 through April 15, 2010 limitations period allowed under Title VII.  Moreover, Mr. Hart notes in his Complaint that he was refused promotions twice in 2009.

---

[9] *See supra* note 8.

These events also could have occurred within the limitations period. This Court finds, applying utmost liberality, that Mr. Hart has not failed to exhaust his administrative remedies or pled claims falling outside of the limitations period under Title VII.

> II. **Plaintiff's Race Discrimination Claims**

Though Plaintiff's claims are not defeated for failure to exhaust, they cannot survive Defendant's Motion for Summary Judgment. Mr. Hart fails to establish the prima facie case for race discrimination. Moreover, he cannot show that Broadway's justification for firing him—that he reported to work while under the influence of alcohol—is pretextual.

> A. **Plaintiff's Claim of Race Discrimination with Regard to His Termination**

Defendant argues that Plaintiff's Title VII claim cannot survive summary judgment because he fails to establish the prima facie case for race discrimination. Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII "is not a general bad acts statute," however. *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir.), *cert. denied sub nom. Bonds v. Sebelius*, __ U.S. __, 132 S. Ct. 398 (2011). "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jimenez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir.), *cert. denied*, 516 U.S. 944 (1995). Indeed,

12

a Title VII claim "is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (citation omitted).

A plaintiff may defeat summary judgment and establish a race discrimination claim under either the "mixed-motive" framework or the "burden-shifting" scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). In a mixed-motive case, a plaintiff must sufficiently plead, through direct or circumstantial evidence, that his race "was a motivating factor" in his employer's decision to terminate him. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-86 (4th Cir. 2004). Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Under the mixed-motive framework, this Court has held that "a plaintiff faces a demanding standard when attempting to demonstrate direct evidence." *Jordan v. Radiology Imaging Assoc.*, 577 F. Supp. 2d 771, 779 (D. Md. 2008). "To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait . . . actually motivated the employers' decision." *Hill*, 354 F.3d at 286.

Alternatively, a plaintiff can establish discrimination under the *McDonnell Douglas* burden-shifting scheme. A plaintiff first bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If a plaintiff successfully presents a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory justification for its action.

*Id.* Finally, if the employer carries its burden, the plaintiff must show that the employer's legitimate, nondiscriminatory reason is merely a pretext for discrimination. *Id.*

To allege a prima facie case of race discrimination under Title VII, a plaintiff must establish with sufficient evidence that "(1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

In this case, Mr. Hart has not presented sufficient direct or circumstantial evidence of race discrimination, so his claim must be analyzed under the *McDonnell Douglas* burden-shifting analysis. Mr. Hart has proven that he is a member of a protected group and that he suffered an adverse employment action when he was discharged. However, he fails to show that he was performing his job duties at a level that met Broadway's legitimate expectations at the time of his termination. It is undisputed that from 2007 through 2009 Mr. Hart was the subject of at least ten separate disciplinary measures for poor job performance, including three suspensions. A long disciplinary history makes it difficult for a plaintiff to prove that he was meeting his employer's expectations. *Cf. Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517-18 (4th Cir. 2006) (finding that a plaintiff employee failed to meet his company's job expectations because he had many negative performance reviews and reprimands); *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222 (4th Cir. 1998) (holding that a plaintiff employee who was repeatedly tardy, failed to submit monthly summaries of her work, and received several

warnings for poor job performance could not show satisfactory job performance under *McDonnell Douglas*).

In this case, Mr. Hart points to three positive performance evaluations from 2006 through May 1, 2008.  Pl.'s Resp. in Opp. Exs. 1B-9B.  These evaluations would, standing alone, be proof of satisfactory job performance.  However, they do not reflect the time period in which Mr. Hart was suspended twice for poor job performance, issued a final warning for excessive absences, failed to report to work, and reported to work while under the influence of alcohol.  Although Mr. Hart's job performance appears to have been adequate in his first few years at Broadway, it is clear from the Defendant's evidence that starting in 2007 he began to develop a long disciplinary record.  In the final two years before Mr. Hart was terminated, his performance was decidedly poor.

Moreover, Mr. Hart fails to present evidence of the fourth prong under the *McDonnell Douglas* framework.  To establish the prima facie race discrimination case, a plaintiff must show that similarly situated employees outside of the plaintiff's protected class were treated more favorably.  *See Karpel*, 134 F.3d at 1228.  In this case, Mr. Hart presents no evidence of Caucasian supervisors who had similarly poor job records or reported to work while intoxicated, yet were not subject to the disciplinary measures that Mr. Hart faced.  Accordingly, Plaintiff fails to state a prima facie case of race discrimination under Title VII.

Even if Mr. Hart successfully alleged the prima facie case of race discrimination, he cannot show that Broadway's legitimate, nondiscriminatory reason for his termination was a pretext for discrimination.  The Court of Appeals for the Fourth Circuit has stated that "when an employer gives a legitimate, non-discriminatory reason for discharging the

plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.' " *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).  A Court should not second-guess an employer's appraisal. *Hawkins*, 203 F.3d at 280.  Rather, the Court's sole concern should be "whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* (quoting *DeJarnette*, 133 F.3d at 299).  In Mr. Hart's Complaint, he not only fails to establish a prima facie case of race discrimination but also fails to prove that Defendant's legitimate, nondiscriminatory grounds for discharging him was a pretext.

Broadway's Vice President for Environmental Services and Facility Management Donald Kelly affirms that he terminated Mr. Hart because he tested positive for alcohol while on his work shift. Kelly Aff. ¶ 22. In doing so, Mr. Hart violated a major rule of Broadway's Standards of Conduct, which warrants discharge. *Id.* Mr. Kelly also felt that termination was the appropriate decision because Mr. Hart was a supervisor charged with enforcing the Standards of Conduct and he had an extensive record of poor job performance. *Id.* Therefore, Broadway has successfully asserted a legitimate, nondiscriminatory reason for firing him.

In response, Mr. Hart does not contend, let alone offer evidence, that Broadway's reason for his termination was pretextual. His only response is that Ms. Petersen treated him differently because of his race. "Merely denying the veracity of the employer's stated reason does not relieve plaintiff of [his] burden of proof." *Bray v. Tenax Corp.*, 905 F. Supp. 324 (E.D.N.C. 1995).  Because Mr. Hart does nothing more than allege discrimination, he cannot

16

meet his burden under *McDonnell Douglas* of countering Broadway's legitimate, nondiscriminatory reason for terminating him. Accordingly, Plaintiff's claim of race discrimination with regard to his termination fails, and Broadway is entitled to summary judgment on that claim.

### B. Plaintiff's Harassment and Failure to Promote Claims

. Plaintiff also alleges that he was denied promotional opportunities twice in 2009 and that Ms. Petersen constantly harassed him from 2008 through 2009. Pl.'s Compl. ¶¶ 4, 8. Neither of these claims raises any genuine issue of material fact.

It is worth noting at the outset that Mr. Hart offers no evidence that Broadway denied him promotional opportunities. He mentions this allegation only once and quite briefly. *See* Pl.'s Compl. ¶ 4. Moreover, he fails to specifically state when these incidents occurred. *See id.* But even if Mr. Hart provided sufficient evidence that he was denied promotions, this claim would fail for the same reason that his termination claim fails. The Defendant has shown that Mr. Hart cannot establish the prima facie case for race discrimination: Mr. Hart neither was adequately performing his job at the time he was terminated, nor can he allege that similarly situated employees were treated more favorably than he. These arguments carry just as much weight in Mr. Hart's failure to promote claim, since his burden under *McDonnell Douglas* is the same.

Mr. Hart's harassment claim likewise fails, because the allegations he makes and evidence he proffers do not support a case for hostile work environment.[10] The Court of

---

[10] A Title VII claim alleging race-based harassment is more commonly referred to as a hostile work environment claim, and this Court will refer to it as such.

Appeals for the Fourth Circuit has set out four elements in a hostile work environment claim: (1) the harassment was unwelcome; (2) the harassment was based on [the plaintiff's] race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). A plaintiff must do more than make conclusory allegations of harassment. "[C]onclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." *Id.* at 802.

For various reasons, Mr. Hart's statements suggesting harassment fail to present adequate evidence of hostile work environment. First, Mr. Hart alleges that Ms. Petersen harassed him in meetings and in e-mails. He proffers no evidence in support of these allegations. Such bare-bones, conclusory accusations cannot support a claim of hostile work environment.

Second, Mr. Hart points to allegedly false statements made by Ms. Petersen in two disciplinary write-ups. He alleges that in a notice of suspension she issued him, she made a false statement regarding his participation in job counseling sessions. *See* Pl.'s Resp. in Opp. 3. Even if there is a factual dispute on this question, it does not disturb the underlying basis for which Ms. Petersen issued the warning. *See* Notice of Suspension, ECF No. 10-11. More importantly, Mr. Hart does not explain how this statement was the result of racial animosity toward him. *See Causey*, 162 F.3d at 801 (finding that a hostile work environment claim failed where there was no indication that the incidents complaint of "were the result of [the supervisors'] animosity toward his race or age"). Mr. Hart also alleges that Ms. Petersen lied in a final warning given to him for excessive absences. As to this allegation, Mr. Hart

does not articulate why the statement is false, nor does he show that the statement was racially motivated. For these reasons, allegations against Ms. Petersen cannot bolster his hostile work environment claim, and do not raise issues of material fact.

Finally, Mr. Hart suggests that Ms. Petersen harassed him by changing his work schedule three times in under one year. Pl.'s Resp. in Opp. 4. In support of this allegation, Mr. Hart provides e-mails in which he complained to Ms. Petersen that these scheduling fluctuations were making it difficult for him to coordinate with his spouse and babysitter. *See* Pl.'s Exs. 18C & 25C. Even if these actions could be characterized as harassment, Mr. Hart does not allege that they were motivated by Ms. Petersen's racial animosity toward him. *See Causey*, 162 F.3d at 801. Consequently, Mr. Hart fails to show harassment sufficient for a hostile work environment claim.

In summary, Mr. Hart does not establish a case for race discrimination on any of the three grounds he alleges—discrimination with regard to his termination, his failure to be promoted, or the harassment he suffered under Ms. Petersen. Accordingly, Broadway is entitled to summary judgment as a matter of law as to all three claims.

## CONCLUSION

For the reasons stated above, Defendant Broadway Services, Inc.'s Motion for Summary Judgment (ECF No. 10) is GRANTED.

A separate Order follows.


Dated:      September 26, 2012              /s/_____
                                            Richard D. Bennett
                                            United States District Judge